Our second case is Case 12-417, Sandifer v. United States Steel. Mr. Schnapper. Mr. Chief Justice, and may it please the Court. We agree with the government that not everything an individual wears is clothes. We disagree with the government as to the appropriate standard for distinguishing things that are and are not clothes under Section 203-0. I'd like to begin with the area in which we're in agreement with the government, although not with response. In ordinary parlance, not everything an individual wears would be referred to as clothes. There are examples of that in this courtroom. Glasses, necklaces, earrings, wristwatches, there may be a toupee, for all we know. Those things are not commonly referred to as clothes. Scalia, I didn't mean to represent that. And nor are neck braces, which I've seen worn in this courtroom. It's also the case that there are any number of things that people wear to do their jobs that are not clothes. The police officers outside the building are wearing guns, radios. I suspect they have handcuffs. I couldn't see those. The quarterback who played for your team yesterday had a quarterback playbook wristband with the plays on his wrist. Workers wear tool belts. It's one of the recurring issues that has come up in these cases are knife scabbards. We don't think anyone would, in ordinary parlance, call those things clothes. And we think that's a significant limitation on this. The company's account of this is that everything that you wear to do your job is clothes, and we think that's just not consistent with ordinary language. And although the government's views have, to some extent, evolved over time in all of this, they've always taken the position that not everything you wear are clothes, even in the 2002 opinion letter, they drew the line at tools and scabbards. And so even though you could be wearing those things, those are not clothes. Tools and what? Scabbards. Knife scabbards. The Tenth Circuit holds a knife scabbard as clothes because it's like holsters. But what we're dealing with here from the picture, that looks like clothes to me. Your Honor, I think that's that your question raises an excellent point. One of the problems with the picture is that it withholds from you other information that you would use to assess whether to describe it as clothes. You don't know what. Kennedy, you would look and say, those clothes probably have something special underneath them. In ordinary parlance, I think that would be a proper use of diction. If you saw an airbag jacket, you would probably call it clothes, unless you're in a question. It looks like a jacket. If you saw a compression torsion, a torso compression bandage in a photograph, you would call it clothes because you don't have all the relevant information. Why is it that the jacket and the pants in that picture are not clothes? In our view, let me – part of it – first of all, they are designed for a protective function, to protect you from catching fire. Alito, this is one of the aspects of your argument that seems really puzzling to me. I don't know when a human being first got the idea of putting on clothing. I think it was one of the main reasons, probably the main reason, was for protection. It's for protection against the cold. It's for protection against the sun. It's for protection against thorns. So you want us to hold that items that are worn for purposes of protection are not clothing? No, Your Honor. We've been – we've tried to be quite specific about that. We distinguish between items that are designed and worn to protect from a workplace hazard. And the court of appeals argued that everything is, in a sense, protective. That is not the standard that we propose. Workplace hazards are different. And in ordinary usage, when things are being used for that kind of protection, they are typically described in other terms. So if it's – if it protects against something other than workplace hazard, it can be clothes. But if it protects against a workplace hazard, it isn't clothing. That's your test? And it's designed to provide that kind of protection. Let me explain why we've added that. There are some instances in which one would wear ordinary clothing on the job. Things are no different from what you'd buy at J.C. Penney's. Because it was to some degree protective from a workplace hazard. That's true here. Whatever else you're wearing, underneath it, you have to wear cotton or wool. You can't wear fabric. But what if you're working out in the sun, so you're wearing clothing so that you don't get burned by the sun? What if you're working out in the cold and you wear a parka so that you don't freeze while you're working? Are those workplace hazards? I don't think in ordinary appellants they'd be called workplace hazards. I mean, that's just the normal vicissitudes of life. But to give you an example of the guy who works in a freezer is not experiencing a normal hazard. So the ---- I think that you would be wearing a parka in a freezer just because it was warmer. I mean, if you stayed in there all day, it would be dangerous. Dangerous cold is the South Pole. The South Pole is a hazard. There will be times when the weather forecast will be it's so cold it's dangerous to go outside. And I think it's that degree of ---- Sotomayor, So you have to pay a worker who's in the South Pole over time for putting on his parka? Well, you put on more than a parka. I think that's the point. To put on his leggings and things like that. There's a whole lot of stuff I'm sure that goes on. Scalia, In Chicago, one had never gone above zero for two weeks. There would come a point where it would, I think people would call it a hazard in ordinary English. But those are not the cases that come up. I mean, we've given you in an appendix to our reply brief a list of all the cases in the last 20 years that we could find involving two or three. That's not what actually happens. We're trying to give you something that makes sense of what's going on. The overwhelming majority of cases involve things everyone would call a hazard. Knives, molten metal acids. I have, I do have an understanding that you're right. That jewelry are not clothes, that toupees might not be, that makeup is not, and they cover the body. So I agree that a definition that says anything that covers the body might go too far. But I do have a problem with things that look like clothes. If I don't buy your argument that fire-resistant pants and shirts are not clothes, where would you propose I draw the line? Assume I say you're wrong on at least if it looks like clothes, it is clothes. Let's apply a little bit of common sense to life. Verrilli, I'm not entirely sure where, what we would fall back to. Let me respond to that question, though, the premise of it a little bit. There's an old saying that if it looks like a duck and it swims like a duck and it quacks like a duck, it's a duck. Sotomayor, It's a very famous thing. Verrilli, Right, right. Well, there's, there's, there's, but, but part of the takeaway from that is it's, you have to, whether you call something a duck depends on all the information you have. Let me change, let me change it a little bit. It looks like a duck, it's floating there in the water, there's a quacking sound, and there's some men in a shed with wearing camouflage gear and guns. It's probably not a duck. And yet if you took a picture of just the duck, you're, you're. Scalia, You don't want to say they're wearing guns. Verrilli, No, no. They're wearing camouflage and holding guns. Scalia, And holding guns. Verrilli, Holding guns. I certainly misspoke. I certainly, yes. But our point is whether you, how you characterize something depends on all the information. Now, you may want to, you may want to conclude, although I think it would be wrong, that even when you have all the information, even if you understand that this is protective in nature, you understand that it has to be worn because of very severe dangers. You understand that the person is wearing a hood over his head not because it's cold, but because although it's probably 100 degrees where he's working, he's in danger of being burned if he doesn't wear it. If after that you call a close, I disagree with you, but I think that's at least the right way to analyze it. But to say a picture looks like close is to, is to ask how we would characterize something if we didn't have all the information. I think that's certainly inappropriate. You have to assess with all the other things that you know and in the full context. Breyer. I have an underlying question, just for my understanding of this. Now, the unions are on your side, and I think they are. I wondered why. This is my thought, which suggests that I may not understand this perfectly. It seemed like to me a brilliant statute, because if in fact the unions, those they put Donning and Dauphin, all they have to do is not put something in the collective bargaining agreement. But and if they do put something in the collective bargaining agreement, they can exert their bargaining power to get something else, which they must want more. So what you, with your narrow definition, do is you prevent the workers from doing that. And so I don't know why the ordinary worker would be on your side of it. Now, I say that because I want you to explain what I'm going to say. I'm delighted that you asked that question. It raises a number of issues, some of them having to do with the way the statute operates today, some of them historical. Let me start with the way the statute operates today. You said, to paraphrase, all they have to do is not put something in the agreement and then they have to be paid. That is not what the statute says and it's not the way it works. The statute says in the agreement or a custom under the agreement, the lower courts, as we've explained in our reply brief, have taken the position that what that means is if there's a collective bargain agreement and it doesn't expressly require that they be paid for the stuff, then not paying for it is a custom under the contract. And so what actually happens is, in these negotiations, and it's described in one of these cases, the gear changes over time. An employer comes in and says, I'm going to have to wear some additional gear. The union objects and says, that's wrong, we ought to be paid for it. They don't succeed in negotiating. Breyer, so that's where the problem lies. It goes the other way. Is there a way around that that doesn't involve this case, Secretary of Labor? Or I guess you could amend the statute, but that's tough. The, I mean, is it? Well, that's the way the statute works now and that explains, it's part of the reason why they're there. But there's something broader in it. This will take a minute, but the historical context is uniquely important to understanding why there was opposition to this at the time. It's sort of a three-act play, if you'll bear with me. The first has to do with the three lawsuits that lead to the Portal to Portal Act. Those are lawsuits between employers and unions. The CIO at this point in time was advancing the rights of workers and interests of workers in two ways. A, in negotiations, and B, if they couldn't get something in negotiations, but they thought it was required under the Fair Labor Standards Act, then they would sue. Or they would take the position in negotiations that it had to be provided. There's a 1991 Buffalo Law Review article that describes this history. And in one of those cases, the union actually struck unsuccessfully for this and then proceeded on a legal track. So that was what the CIO was doing. They wanted both. They wanted both the statute and negotiation. In the House version of the Portal to Portal Act, Section 3 effectively banned that. Section 3 said if this, if something's going on and it's a company practice and it doesn't violate the collective bargaining agreement, it's legal. It grandfathered, and this was the CIO objected to this, and this was not adopted. It grandfathered in all existing violations. Indeed, it prospectively grandfathered things in, because if they would adopt a new practice, it would be legal. And the example that the CIO gave was suppose it was the practice of the employer to turn back the clock an hour every day, and that would have been permitted. So the Senate rejected that, and it didn't end up in the bill. Now, what happens is this comes back in another version in 1949 with a very different Congress. And my brother has referenced a comment, it's buried in a long statement by the National Association of Manufacturers, essentially asking for this old language. They did it a little bit differently. It would be a mistake to assume Congress just picked up the work of the last Congress in 49 and said, oh, well, we didn't, all we were trying to accomplish didn't get accomplished. Let's work on it some more. The 48 elections had completely changed Congress. As you may recall, Dewey did not win that election. The Republicans lost the House, they lost the Senate. The sponsor of the House bill was defeated. And the new members of the House and Senate included Hubert Humphrey and Gene McCarthy and a very different group of people. They were not there to further the agenda of the last Congress. The Herter Amendment was a somewhat — not what was adopted, what was proposed was a version of this. It said anything about the length of the workday is legal if it's in a contract or in a custom or practice under a contract. It doesn't, didn't — we know from experience that custom or practice under a contract works for grandfather things, old things and new things. Went over to the Senate and the Senate rejected that and then ended up with this narrowly drawn provision. So that's why. Roberts, we began with the unions are on your side. Is the United Steelworkers of America on your side? No, they have not filed. They agreed in the last collective bargaining agreement not to file. Well, it does seem to support the notion that this is something that should be left to the collective bargaining process. Your Honor, it's not being — the view of the opponents of this kind of proposal, which was repeatedly directed, was it isn't being let — you're essentially carving unionized plans out of the protections of the statute. You're stripping the workers of their statutory rights and saying to a unit, if you can negotiate for something, that's fine, but the statutory rights are there. No, the point would be that the steelworkers gave up something when, you know, it's a part of a bargain, okay? If they say, all right, we're not going to count this time, but, you know, you've got to give us 10 more cents an hour or, you know, greater cafeteria facilities or something, it's a normal part of the bargaining process. And it seems to me that if they're willing to give it up to get something else, what's the benefit to them of saying you can't do that? Again, if I might return to the first part of my answer to Justice Breyer's question. The way this ordinarily works, and it's reflected in the cases we described in our yellow brief, is that the company's position is this is — we don't need your permission to do this. And that's true. That's true in one sense, which is if not permitted, unless the contract bans it, it becomes a de facto practice and it's legal. But it's also usually the company's position that the union is wrong about the meaning of the Fair Labor Standards Act. There's a dispute in this case on the part of the company as to whether this is a principal activity. They've argued it's de minimis. So this is an issue about which people bargain the way they would bargain about an extra holiday. But it is not a situation in which the union walks in, is entitled to this, and trades it for something. That simply isn't what's going on. No, but if the union — is it consistent with the union's duty to represent your client for them to bargain away something to which your clients are entitled under the Fair Labor Standards Act? The company's position is it's not something that they're entitled to. No, no. The union. If the union — I understand. I understand the question. But the union can go in and say we think we're entitled to this under the Fair Labor Standards Act, and the company would say no, we don't. And then if they can't get it, it's — Ginsburg, Mr. Schneider, can I ask another question? We're talking about time and whether it will be paid. And we have one worker that puts on this protective scarf, and then we have another, the baker. It takes him about the same amount of time to put on everything he has to put on. But everybody agrees he doesn't get paid for that. What is the — that would come within the clothing. So we have all kinds of people who have to wear special uniforms, a doorman and an apartment house. It takes them time to put it on. Why should there be a distinction in getting paid between the protective scarf and something that you must wear on the job? Is that — yes. Our answer to that, Justice Ginsburg, is that the statute says clothes. It doesn't say anything you wear. And we agree with the government that there are things you could put on that would not be clothes and that you'd have to be paid for. And we — I think we disagree with the government about what those are. But there's — but — but — and indeed, the court of appeals in this case, and most courts of appeals, have held that there are things you put on that are not clothes. So the statute distinguishes between clothes and other things. We have to figure out what that distinction means. But I thought that your distinction was, well, there are two sets of clothes, to use a better word. There are two sets of clothes. They both look like clothes, but one is for protective, a protective function, and one is for a sanitary function. And that's the distinction that you want to draw. And I guess another way of saying Justice Ginsburg's question is, why should we look at a word that just says clothes and make that distinction as to what the purpose of changing clothing is, whether it's for sanitary reasons or whether it's for protective reasons, or whether it's because people want doormen to look nice? Well, Your Honor, I think in ordinary parlance, whether you're going to call something clothes or not depends, as the government says at page 25 of its brief, on both its form and its function. And there's a continuum of things, and you have to draw a line somewhere. Scalia, but common usage doesn't separate from the meaning of clothes only those protective garments that are required by the occupation that are required by the employer. That's a very strange definition of clothes. Hunters, when they're hunting birds, wear trousers that are brush-proof. They, you know, resist briars and other things. Those are protective, and those pants wouldn't be worn elsewhere. Now, I can understand your arguing those are not clothes because they perform a protective function other than heat and cold, but you're proposing a very odd definition of clothes. It excludes only those protective garments that are protection against workplace hazards. That's very strange. Well, Your Honor, we are not undertaking to give you a comprehensive definition of what items are and aren't clothes. The variety of things people wear is extraordinarily complicated, and we have not taken that on. What we have tried to suggest is that you have taken it on. And you're trying to tell us what is the ordinary meaning of clothes. That's what you're appealing to, the ordinary meaning. Your Honor, I suggest the ordinary meaning is not what you have proposed. Well, we may disagree up to some extent, but it includes protective garments. And you want it to include all protective garments, I guess, except those that protect against workplace hazards. All we're asking the Court to hold is that certain things are not clothes. We're not undertaking to sort out among the things that hunters wear where you would draw the line. I mean, ordinary parlance is complicated. But we think, look, it's certainly the case, we believe, that not everything people wear is clothes. And the problem is to fashion a standard. We think the government standard simply doesn't work. And it doesn't work for two reasons. The standard, as we understand it, and my brother will address this in greater detail, is that the Court should distinguish between clothes on the one hand and equipment devices and tools on the other. Now, we think this doesn't work for a couple of reasons. First of all, the distinction isn't clear. In footnote 6, they note the lower courts have been divided about gloves and then say they think gloves are clothes. They don't explain that. They note that the lower courts have been divided about leather aprons. At page 24 and 25, they describe labor ward decisions and some other things which have characterized certain items as using clothes as clothes. And then, you're saying you're not going to give us a test. You're just going to criticize their test. No, no, no. Our test is, an item is not clothes if it is worn to protect against a workplace hazard and was designed to protect against hazards. And, but as I said, if I might just finish my point, the government standard is, it's not clear how they got where they did. They notice there are divisions about a number of different things, and then what they describe as on the not-clothes side of the line on pages 24 and 25 sound a lot like what people are wearing here. In addition, casting it as the government has forces the lower courts to decide what are equipment, tools, and devices, because anything that's not an equipment, a tool, or a device would end up being clothes. And that simply recasts the question about some words that are not in the statute. The words that is somewhat broader and doesn't trigger all this is gear. And if I might say just one or two things about it. The Court, the government used the word gear in its 1997, 2001, 2002, and 2010 opinion lists, although they take different substantive positions. They quote the word equipment from this Court's decision in Alvarez, and the word equipment is there twice, but the word gear is used 28 times. And a month ago when I was here and the destruction was still going on outside, there was a sign outside, and it depicted a worker with an arrow pointing to and labeling his hard hat, his goggles, his work gloves, and his boots, and it said, do not enter without proper gear. So I think that's just pure gear. Roberts, What about heavy-duty pants, you know, blue jeans that somebody, thick ones that you use because the work environment will involve, you know, grease and hot things and all, but that you wouldn't necessarily or a particular worker wouldn't wear off the steel mill site? Is that clothing designed to protect against work hazards, or is it some people would wear that outside the steel plant, other people wouldn't? Certainly people wear blue jeans under all sorts of circumstances. Yes, but there are heavier-duty blue jeans that are made out of a particular fabric that you would see commonly in the steel mill, but you maybe wouldn't see commonly outside. If there was something identifiable in the mill that was a hazard, that might fall there, but we've also taken the position, and I'm not quite sure, I'm not familiar with these particular kinds of items, that things that you would wear that weren't designed to deal with hazards wouldn't be within our carta. Thank you very much. I would like to reserve the balance. Thank you, counsel. Mr. DiNardo. Mr. Chief Justice, and may it please the Court. When Congress enacted 2030, the Portal Act had already relieved employers of the obligation to pay for changing into or out of ordinary clothing. There's little question that 2030 was directed at the sort of clothing that, absent 2030, could be deemed to be a principal activity, the changing into or out of clothing that was not already excluded by the preliminary and post-preliminary exclusion in the Portal to Portal Act. Congress referred in 2003-0 to time spent changing clothes, to time spent changing clothes that is excluded from the workday pursuant to an agreement, a collective bargaining agreement. It was in the context of an agreement with the labor organization that the time would be excluded. Collective bargaining takes place around activities and determines how certain activities are to be treated. Collective bargaining does not focus on whether or not a shirt is closed or a pair of pants are closed or protective eye gear. And that is how the statute was written. Given those two points, the term closed, as used in the statute, was intended to imply that workers were required to change into and out of to be ready for work. That's the logical conclusion of the statute. Sotomayor, does that include a scuba tank? Your Honor, it's Because you can wear anything to be ready for work. I, my own inclination is to say that a respirator unit on your back is not closed the way a scuba tank isn't. So it can't be just something that covers your body. Or ready for work. If the labor organization and the employer, for whatever odd reason, would decide that part of the outfit you need to be ready to go to work included the tank, that doesn't make a lot of sense, because it would make more sense to put the tank on when you get to the location where you're going to perform your principal activities. But were they to do that, that's what this statute empowered them to do. And in terms of customer practice, I should mention this. Sotomayor, why wasn't the statute written that way? Why wasn't it written? I mean, they use very specific words, changing clothes. That's, in my mind, narrower than your definition. Well, Your Honor, they use those words with other words when they say, any time spent in changing clothes that the labor organization and the employer agree shall be excluded. They don't say it in the abstract. It is pursuant to an agreement. And a customer practice, and the case law will bear this out, is an agreement. It is not unilateral action, Your Honor. It is by either very open acquiescence or long-term acquiescence. Breyer, what I think he's saying is this, that my puzzle was, why is this a big deal for the unions? All they have to do is keep their mouths shut, and the employer is going to have to go to them and say, we want this in the agreement. But he said, but you haven't read those words, customer practice. And if you see the words customer practice, you'll see that an awful lot of businesses or firms or manufacturing across the country actually has long had a customer practice where they didn't pay for that. You know, they didn't exclude it. Or they didn't so in those circumstances, it's the union that's going to have to go to the employer and say, please put some other words in the agreement so we get this out of the statute. And now, I have no idea. I think that's what his point was. And, of course, this is an empirical question in part of that kind of point, which is logically sound, affects a certain number of workers in industries. And I would next be curious, either you or the SG or anyone, has some estimate of what we're talking about quantitatively. So the first part of the question, the notion of customer practice is a notion of agreement, or at the very least, long-time acquiescence. If a union is not able to get a provision in a labor contract that satisfies it on this subject, it simply needs to object to the nonpayment. And then the question becomes, is this close changing preliminary or post-preliminary under the Portal Act and therefore not work, or is this a principal activity that absent an agreement under Section 2030 is work and must be paid? The notion that customer practice is something that an employer can unilaterally adopt is simply false. There must be the union's agreement, either expressly, as there has been for 60 years in this labor contract between steelworkers and U.S. Steel, that this entire block of time will be excluded, or a union must say by its silence or absent an agreement, a formal written agreement, but its verbal agreement, this is acceptable to us. We need not be paid for this beginning-of-the-day block of time. And our suggestion that the test ought to be what these parties agree will be part of the work outfit that will start the day is in large measure a recognition of the way collective bargaining operates. A labor union and an employer don't say, should there be pay for putting the hat on or putting the jacket on? The discussion surrounds, what do we do about this 10 minutes or 5 minutes or 3 minutes or 15 minutes that precedes active, productive work? Do we include that activity? Now, granted, Your Honor, they said any time spent in changing clothes pursuant to a collective bargaining agreement, because that was the nature of the debate that preceded the 1949 amendment. The Department of Labor said perhaps some clothes changing is not preliminary or post-preliminary. Perhaps it is a principal activity. They started the discussion around clothes changing. But the industrial practice that was being debated was this beginning-of-the-day activity, the locker room activity of getting yourself invested in the outfit you need to wear to be ready for work. Ginsburg. Mr. Donato, in this case, does it matter if we take your position that anything you need to wear to be ready for work or the government's position, and I think it was the Seventh Circuit's position, too, that equipment is different from clothes? But here, the Seventh Circuit said the equipment that's involved, hard hats, glasses, earplugs, respirator, none of those things, they take the minimum time, so we don't have to worry about them. In this case, will it make a difference if we go your way and say everything worn counts, while the government's way saying, well, at least clothes count, but equipment can be distinguished? So in our particular case, Your Honor, this does not matter. The items, the hard hat, the earplugs, the protective eye gear, and the respirator are not at issue in this case. The lower court said the time is de minimis, and it doesn't matter. Clearly, the items here are clothes, the government agrees they're clothes, they're clothes by any measure, by any test. But on a going-forward basis, this notion that there is a dichotomy between clothes and equipment is a problem. Kagan, could you give a few examples of when it would make a difference, the difference between your test and the government's test? Well, it will make a difference, Your Honor, in all of those circumstances where part of the outfit that you put on to wear to be ready to work is not something that one might, absent an industrial context, look at and say intuitively that's clothing. Well, like what that's not de minimis? So for example, well, in many respects, I should say, these sorts of items are, in fact, de minimis. It takes seconds for a police officer to put a vest on that has that's made of Kevlar, for example, a modern fabric that can protect, and yet it's specialized. But it's a matter of seconds. But that's the sort of argument you would leave the lower courts to deal with. Is that vest, one might call it equipment, the government might, we don't know, or they might call it clothing. And here's an opportunity to deal with that in a definitive sort of way. I guess it just seems that in most of these cases, everybody's just going to say it takes two seconds to put on a pair of eyeglasses. So I guess I'm struggling with why you and the government are fighting so hard about the proper test. Well, again, we're not fighting that hard because they urge affirmance. But the proper test, I would suggest this. As the court of appeals mentioned, is this clothing or equipment? And it answered its own question. Well, really, it's both. The problem with trying that dichotomy is you'll leave everyone to argue, is this particular item, quote, equipment? So is the worker in the meat factories chain-link vest, vest or shirt, they call it a shirt, but it's made out of chain-link, is that equipment or is that clothes? I think the government is, you and the government are fighting simply because the government is being principled. The word of the statute is clothes. And nobody would consider eyeglasses or a wristwatch or some of this other specialized equipment to be clothes. I mean, the word is what it is. And I mean, it's wonderful to say we can eliminate all the problems by, you know, saying everything is clothes, you know, everything, no matter what, wristwatch, eyeglasses, well, yeah, it makes a lovely world. But it does not adhere to the words of the statute, which says clothes. Doesn't that mean anything? Everything is clothes. It does mean something, but it must be read as part of any time spent. But what if it's difficult? Why not just say clothes, at least from your point of view, clothes are those items that have as a significant purpose the covering of one's body. That's not the purpose of eyeglasses. It's not the purpose of wristwatches. It's not the purpose of cameras held around you. It's not the purpose even of an iPod or an iPod. The statute is activity-focused. If we look at what is there anything wrong with what I just said? There is, Your Honor. So what of opening your locker? Opening your locker. Opening your locker is not clothes. Yet the time is excluded. Yet the time is excluded. But still, we're back to the statute, which says clothes. And therefore, what's wrong with the definition I just proposed? Well, as a practical matter, labor organizations and employers don't negotiate that way. They don't say we'll pay you for the eyeglasses, but we won't for the shirt. Well, that's up to them how they negotiate. But the statute says clothes, so we would have to pay for the clothes time. They'd have to pay for the clothes time unless it's in the collective bargaining agreement or, you know, if it's in the collective bargain, unless it's in the collective bargain. Unless it's in the collective bargain, or custom and so forth. And then you look up the definition of clothes, and it's any covering for the human body, and it includes accessories. No. So why does it include eyeglasses? Eyeglasses do not have as a principle, as a significant purpose, the covering of one's body. The safety glasses that go over the eyeglasses are, in fact, designed to cover the part of the face. They are designed to cover part of the face. If we leave If it doesn't matter, why make a liar out of us? Why, you know, why make us say something that everybody knows is not true? That everything you put on is clothes. But it's not everything you put on. It's earrings, eyeglasses, whatever. It would be the work outfit that the employer in the union agreed you need to have on your person to be ready for work. You cannot get that very precise limitation out of the word clothes. You just can't. And say it's only protective gear for work. It's not other protective gear. Okay? It's only those earrings you have to wear for work. Otherwise, earrings are not clothes. Ah, but if they are required for work, they become clothes. That doesn't make any sense. It's less required for work, as it is the Congress was after allowing this block of time to be dealt with. So maybe we could call them constructive clothes, which means they are not clothes. And it's less the individual nature of the item as it is the activity. Is this part of the activity of changing your clothes? And if part of the activity of changing your clothes is taking off your eyeglasses and putting them in your locker and putting safety glasses on, that piece of time is covered by the statute, even though in reality the union wouldn't bargain over that piece of time. They would argue they would bargain over what shall we do with this pre-shift time. Leaving the matter. Sotomayor, your definition would include somebody spending an hour putting on a suit of armor if he's going to be a jouster. It would include the space people who put on that complicated white suit that has all the connections to equipment. Well, I would suggest that what it's made of should not matter. So the material shouldn't matter. Right. The function shouldn't matter. In terms of the time. If the function doesn't matter, then how do we define clothes? The function should matter because. The function covers the body. Sometimes it could be for protection. Sometimes it could be for identification. So some people have to wear certain things so they are identified. Other people have to wear things that work so they are protected. I think that shouldn't matter. And the length of time, frankly, shouldn't matter because the agreement must be bona fide. The statute has a protection for a union that doesn't extract something in exchange for agreeing that this increment of time will be excluded. The statute requires that the labor agreement be a bona fide labor agreement. So the obligation of bargaining and fulfilling your obligation of fair representation is built into the statute. I believe there has been a great deal of focus on an item-by-item investigation of these issues in countless numbers of these cases, and that is the wrong approach. Alito, nothing has been said about the word changing. Maybe you could say something about that. Isn't it awkward to refer to the changing of clothes when all that the person is doing is putting on clothing on top of clothing that the person is already wearing? It's not the way the term is normally used, is it? So I would say this. In this particular case, the facts of this case and the records replete with declarations, the most common event is a worker comes to his locker, takes off some of their clothes. They have to be required to put their personal long underwear shirt on and long underwear pants on, then the gear that's in the gear, then the clothing that's in the picture. That's the actual events in this case. But if someone were to come in and in their long underwear and not have to take their record on, then the question becomes have they changed because they've simply layered. I would say this. It's not the most common use of the term changing, but it is an ex — it is a definition of changing to make different. I think it would happen here. So it's actually not the facts of this particular case. I think the word is certainly broad enough to encompass. And lastly, it would make no sense in the statute to allow the personal idiosyncrasies of those people coming to work, someone who decides to layer their items over what they have on, someone else who decides to take them off before they layer. I would say that reading the statute as an activity-based statute is consistent as well with the notion of washing, which is in the statute. We don't think of turning a shower on, necessarily, or retrieving a towel as washing. The statute excludes time spent washing, and we don't try to drill down what exactly is washing. We say in closed cases, the determining factor should be the agreement the labor organization has reached with the employer. Leave all of this craziness about whether a particular item is covered or not covered to the parties closest to deal with it, the labor organization and the employer, who have had in this particular case 60 years of dealing with this. If you say to a worker at U.S. Steel, go change your clothes, they will know exactly what you meant, and they will take that to mean, put my hard hat on, put my protective eyewear on. They will do that. Scalia. Are there no non-unionized employers that have to confront this problem? Your Honor, it's not. And they have to pay, they have to pay for work time, no? So the statute only covers, 203 only applies in unionized workplaces. It's only where a labor organization and and and and and everybody else has to pay for the for the changing time, right? Unless it's preliminary or post-preliminary. So you so you have the same issue there, don't you? Well, yeah, it's somewhat. And the union cannot pull your chestnuts out of the fire. Well, there's of course there's no union present. So the question becomes, is it a preliminary activity? Is it ordinary clothes changing that's not a principal activity, et cetera? This there's clearly this applies in unionized workplaces. There's a representative of these employees. They can bargain over these blocks of time, over these activities, and determine how best to deal how best to deal with it. Thank you. Thank you, counsel. Mr. Yang. Mr. Chief Justice, and may it please the Court. Mr. Yang, I will let you speak, but could you answer Justice Scalia's question? Would our – if we were to adopt your colleague's broader definition, would it affect our preliminary and post-activity definitions? Not at all. We only get to the question of Section 3.0 when a preliminary activity is deemed to be so integral and indispensable to the primary work that itself is primary work and therefore would be compensable. So as, for instance, the Court held in Steiner, there was chemical plant workers who the donning and doffing of their clothing for work purposes was so indispensable to their chemical factory work, it was deemed to be essential. In that context, you might have a collective bargaining agreement that allows the union on behalf of employees and the employer to provide for an alternative method of compensating this type of work. And in that context, there are two central inquiries that I would like to address today. First, are the items clothes? We think clothes actually has some textual meaning here, and then clothes is a limit, which I'd like to discuss a bit further later. But second, if the employee puts on both clothes and some non-clothes items, does the overall process still nevertheless constitute the activity of changing clothes? Now, we didn't have to go in great deep depth into that question in our brief, because all the items here are clothes. But I think it would be actually quite useful to discuss for a little bit the activity of changing clothes, and then to discuss the specifics. I think it would help the Court out, at least providing a more general rule. The activity of changing clothes is used in the statute to exclude time spent in changing clothes. Congress used the gerund changing to describe an activity. It is a verb form. It's modified by changing, by clothes. So it is an activity of changing clothes. We think that activity also includes ancillary matters. So, for instance, if a worker comes into the locker room, spends some time doing the combination on the locker, opens it up, opens the locker, that is not actually changing clothes per se, but it's part of the activity of changing clothes. So, for instance, if the worker also happens to put on some goggles, pop in an ear plug, maybe even snap on a utility belt in the context of changing clothes, those things are part of changing clothes as part of the statute. Now, Kagan Oh, so then what does separate you from Mr. DiNardo? Now you're sounding exactly the same. Yang Well, no, I don't think so, because on the margin, we are largely the same. I think for the mine run of cases, we will be at the same result. However, there are some marginal cases where there is a collection of equipment, what we would deem to be equipment, which is put on by an employee that is so significant that it no longer can be fairly treated in conjunction with changing clothes. Kagan Like what? Yang Well, this is an area, an issue that comes up frequently in the meatpacking industry. And I can explain — I need to explain a little bit about the facts to explain why we think that that is a much more difficult question. So in the meatpacking industry, for instance, particularly meatpackers that are rendering large portions of the beef, either with electric saws or very sharp knives or similar instruments, they actually have to put on what the government considers to be, or has considered to be, items of equipment. So, for instance, the meatpacker might have a chain mail, kind of like armor, sleeve, chain mail gloves, another sleeve, chain mail kind of all over the front end, a belly guard, a plexiglass belly guard. This is something that is very rigid. You can't even sit down on it. And in fact, you have to sterilize it in a chemical bath before you go into the plant. You have metal arm guard, or metal or now plexiglass because of weight, arm guard on the front that helps to deflect blows for your non-life arm. These types of things, we think, would not normally be thought of as clothing. And so when you put on a shock, either before or, you know, under or over it, we think that the overall process there might not be fairly deemed to be considered changing clothes. Now the difference, isn't this what some courts have described as de minimis activity as they did with the safety glasses and the hat and the earplugs? How about a metal apron? That some meatpackers only do a metal apron. Well, that may well, this is again going to be somewhat fact dependent, and I don't mean to provide a general rule for all cases. Well, actually, that's what we're looking for, so why don't you? No, no. I think while we are trying to provide general principles, they're not necessarily going to resolve all cases. They're not always going to make a case easy. And I think on the margin, and the meatpackers does involve a marginal case, you're going to have the questions. If it's just one item. Alito, what you just said I find quite confusing. I could make a list of things that are considered to be clothing. One of them would be a jacket, perhaps. One would be a vest. And if you tell me that a vest is not clothing if it's made out of metal, then I don't know why Mr. Schnapper is not right that a jacket is not a jacket if it's got extra flame protection, protecting chemicals in it. Our point is a linguistic point, which is to say I don't think all these things are normally characterized as clothing. For instance, there are certain items in the body that are so distinctive in form and function, they don't have normal analogs in what you would find people wearing in ordinary garments on, you know, in everyday life, that it's deemed to be different. There are certain armor-type things, and I think maybe because etymologically armor, with the unique military context, tends to, we tend to call these things equipment. But, for instance, the belly guards, in I.B.P., this Court called those things protective equipment. And I think that's the normal use of the term in that context. Just because you might say, oh, it's a vest, a chainmail vest for the specific function, particularly when aggregated with the rest of the equipment used in the meatpacking industry, makes it an arguably different case. This case, however, I think is quite different. And I wouldn't necessarily use the term de minimis. We agree with the general concept that the Seventh Circuit reached, but de minimis is a term of art in the FLSA. It involves, as we explained to the Court in our TUM brief, which is the companion case to I.B.P., it requires an aggregation of all the time deemed to be de minimis, there's a regulation, section 785.47, that imposes some other requirements. We think it's not so helpful to use that term, but we think within the meatpacking industry puts on something that would be clothing, but also puts on all these other things that you say are not clothing. Now, you would say in that situation, putting on all this additional stuff is not ancillary, and that is for what reason? Because it takes more time in relation to the clothing, or the number of non-clothing items exceeds the number of non-clothing items? What does that mean? Well, I think it means that when the process is predominantly involving equipment and not clothes, we would think that it's different. And I don't think there's really any question that there has to be a line. For instance, if an employer had an employee go out and as part of the work, changing the clothes, also go and collect your tools for the day, and assemble them in your tool belt, no one would say that's changing clothes, even if at the end of all of that you put on your top, your jacket, and you walked out. So we're simply trying to draw a line that I think faithfully reflects the common understanding of clothes in this context. At the same time, we believe that the term clothes is quite broad. Breyer, do you have any estimate on the empirical – there are only two people who know the Department of Labor, the AFL-CIO, and they didn't tell us the latter. So what we're thinking of, I think, is workplace hazard clothing, okay? And the problem I think that was raised is that the union can't stop, can't, can't, can't make an agreement about this without a lot of trouble anyway. They can't just shut up, in other words, and see that the – there will be compensation, because there's a custom or practice in the industry of giving, of not giving the right to change. There has to be a custom or practice under the collective bargaining. Breyer, but they've had collective bargaining agreements in steel forever, all right? So if we go back to 1949 or 1952 and they entered into some big deal agreement, I mean, what was the custom or practice at that time? I don't know. I suspect you don't know, and I wonder if the Department of Labor knows. I wonder if anyone knows. On the record in this case, I don't think the custom or practice was to not separately compensate. All right. So they're saying, you see, they're – That was actually made express in this case. And I think that's actually illustrative of the type of things that we're talking about. Remember, we're talking about 100 percent cotton. If you look at the label, it's in the record, 100 percent cotton jacket and pants. You've got, you know, arm guards, wristlets and leggings. But these things are quite analogous to what we would have in normal clothing. And then you have some things that are on the edge. But we think that when that's done in conjunction with changing clothes, that's incidental. Just as an employee might put on a name tag after they dress or put on their ID badge for security purposes or snap on a utility belt, these types of things are incidental. Sotomayor, you want us to say it's incidental instead of de minimis. That's our preference. What's the consequence of calling it incidental? Well, we think it avoids complications and problems with the special doctrine that applies more generally in the FLSA, which is the de minimis time doctrine. Roberts. Thank you, counsel. Mr. Schnapper, you have 4 minutes. I'd like to address a number of questions that were asked earlier and then to a responding point my brother made. With regard to the question from Justice Breyer, it is the experience of the United States Food and Commercial Workers that the position companies take with regard to this, these items, is simply another bargainable unit, item, like a holiday. It is not treated by them as something unions are entitled to. Justice Ginsburg, you asked why it matters here and whether the items, how we characterize the items about which the government would disagree with the company, at least in isolation. And it matters for two reasons that have to do with the broader context of the Fair Labor Standards Act. First, as we explained in our reply brief, there is an unchallenged rule that an employer has to pay a worker for carrying tools or other things needed to do the job to the workstation. If anything in this list isn't closed and the workers have to have it at the workstation, it would presumptively fall within the tool-carrying rule. So it's very important to the company in this case that all of it be closed. It's also important under the position that the government took in its brief in Tum, which was a companion case to Alvarez. The government's position with which we agree is that once there is any non-2030 exempt item, it starts the calculation of the de minimis time, which then includes not only the time for that item, but the travel time that follows. It starts the de minimis clock. If that's right, then if anything in this case isn't 2030 exempt, the company would have to change its practice. Justice Kagan, you asked more broadly why the test matters, and I think the government was moving in this direction. There is generally few, if any, cases involving poultry or poultry processing in which there is stuff that would meet the, well, if I had a photograph of it, it looks like closed test. It's almost all gear. And so in that industry, it's of enormous importance the difference between the government's position in its, at least in its brief, and the company's position. That has great implications for those plans. Finally, if I might respond to a point that the government made. The government has introduced another concept, I think, that's not set forth in the brief, but I want to address. And that's that in addition to the process that would go on on any of our standards of separating out what things are closed and what things are not closed, the government would then overlay that with an ancillary test. And if it's predominantly closed, then the whole thing counts as closed. If it's predominantly non-closed, it goes the other way. I don't know. I think that's another area of uncertainty it shouldn't inflict on the lower courts. And it's not consistent with the statute. The statute doesn't say changing clothes and ancillary stuff. I'd agree about opening the locker. It's necessary to change your clothes. But when you start taking things which the government would agree by themselves aren't closed, and say, well, this falls within changing clothes even though it's not closed because it's sort of happening at the same time, it seems to me you're opening up another can of worms that should stay closed. Kagan, what is the practice in the poultry industry to which you referred? Are those unionized workplaces and have they bargained on this? I believe about 60 percent are and the rest are not. The poultry industry filed a brief. And under where they have collected bargaining agreements, are they compensated for this time or not? Generally not. Generally not. The unions have not been able to negotiate that. It's the arrangement that I just described. And of course, there are a large number of non-unionized plants. They have to pay for all this. Do you happen to know why the government hasn't issued a regulation on this? It seems the quintessential question of statutory interpretation to which we would normally defer to the agency, why hasn't this is really a question to Mr. Yang, but do you just happen to know, given the history of all of this and all these guidance documents, why they've never just, like, come to everybody's aid and issued a regulation? I do not know, Your Honor. Too complicated is why. If the Court has no further questions. Thank you, counsel. The case is submitted.